**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2010-KA-00625-SCT**

*ALGERNON WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT: 04/05/2010
TRIAL JUDGE: HON. M. JAMES CHANEY, JR.
COURT FROM WHICH APPEALED: WARREN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: OFFICE OF INDIGENT APPEALS
    BY: ERIN E. PRIDGEN
        LESLIE S. LEE
ATTORNEYS FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
    BY: BILLY L. GORE
        SCOTT STUART
DISTRICT ATTORNEY: RICHARD EARL SMITH, JR.
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 10/20/2011
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE DICKINSON, P.J., CHANDLER AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Algernon Williams was convicted of shooting into a dwelling, when ballistics testing revealed that the shots were fired from a gun he had admitted owning, which was in his possession during the time of the shooting. He claims he received ineffective assistance of counsel, but the presented issues are not based on facts fully apparent from the record. Therefore, the claims are more appropriate for post-conviction-relief petitions, and we dismiss both of Williams's claims without prejudice.

## FACTS AND HISTORY

¶2.   Around 5:00 a.m. on February 22, 2009, someone fired several shots into the house where Carolyn Wells lived with her three sons: Damon Brown, Charlie Brown Jr., and Anthony Wells.  Bullets and shell casings were recovered from the scene, and Damon – who had returned home in a car belonging to his girlfriend, Markeisha Stelivan, thirty minutes before the shooting – indicated that he believed Algernon Williams had been the shooter, because Williams had dated Stelivan before Damon had.

¶3.   Officers went to interview Williams at the home of his then-girlfriend, Nesha Brown.[1] After a search of the house and a nearby SUV, police found a box of ammunition and a gun in the SUV, and an unused round in Williams's pocket, all of the same caliber as the rounds found at the Wells home.  Forensic testing revealed that Williams had gunshot residue on his hand, and that the casings and projectiles found at the Wells home had been fired from the gun found in the SUV.

¶4.   Williams admitted to investigators that the gun was his; that it had never left his possession that night (including during the time of the shooting); and that no one else could have gotten it from him.  Williams admitted that he had fired the weapon earlier that night at an old church, but denied having shot into the Wells home.  Subsequent investigation revealed that the church Williams described had burned to the ground at least a week before the shooting.

---

[1] Nesha Brown is not related to Damon Brown, Charlie Brown, Sr., or Charlie Brown, Jr.

¶5. The defense's theory was that the shooting could have been committed by Tina Brown, who was the mother of Nesha Brown. Tina was then in a relationship with Charlie Brown Sr., the father of Damon Brown and former boyfriend of Carolyn Wells. So, whereas the State's theory was that a love triangle between Williams, Markeisha Stelivan, and Damon Brown had prompted Williams to shoot into Damon's home in jealousy, the defense's theory was that a love triangle between Tina Brown, Charlie Brown, Sr., and Carolyn Wells had prompted Tina Brown to shoot into Carolyn's home in jealousy.

¶6. It appears from the record that the defense developed this theory during trial, as neither side subpoenaed Charlie Brown, Sr., until the second day of trial, and he was not on either side's witness list. The State claimed it had not even heard the name "Charlie Brown" until the beginning of the trial, but was able to serve him with process during the first day of trial. But after speaking with Brown on the telephone and determining that he did not have any relevant evidence, and that he was with his wife – who has having surgery in Jackson – the prosecutor released Brown from his subpoena. The defense was not able to locate Brown to serve him with process and did not speak with him at any point.

¶7. At the close of the State's evidence, the defense moved for a directed verdict, which the court denied. The defense then requested a continuance for the purpose of locating and securing the presence of Charlie Brown, Sr., who was to be the defense's only witness. According to one of the defense attorneys, Williams had informed him after trial had started that the SUV in which some of the ammunition was found was owned by Charlie Brown, Sr., who had purchased it for Tina Brown.

3

¶8.    The court denied the continuance, but allowed the defense to make a proffer, in which the defense suggested that Brown Sr. would testify that at the time of the shooting, he was in a romantic relationship with Tina Brown, and that he had bought for Tina the SUV in which the gun was found. The defense explained that this would lead to the inference "that women who have gotten the same lover have often had problems between each other, and it's reasonable that [Tina] could have shot the house up."

¶9.    Despite denying the continuance, the court permitted the defense to make an opening statement in which Williams's attorney stated: "Charlie Brown is expected to testify and will show that . . . he was involved in a romantic relationship with Tina Brown at the time this took place and, in fact, purchased the vehicle that the gun was found in for Tina Brown." The defense called Brown and then rested when the bailiff was unable to locate Brown. The jury returned a guilty verdict.

¶10.   At the sentencing hearing, Williams's two attorneys moved to withdraw from the case, saying that "there exists no trust between our client and . . . Mr. Vance and myself, and at this point I think that it's incumbent on us to ask to be relieved." Williams's attorneys acknowledged that "if [Williams] chooses to perfect an appeal, . . . there's a notice – a request for a new trial and . . . judgment notwithstanding the verdict" that needed to be filed. The judge denied the motion to withdraw and sentenced Williams.

**ISSUE**

¶11.   The only issue raised on appeal is whether Williams's trial attorneys rendered ineffective assistance in violation of his Sixth Amendment right to counsel by failing to file

4

any post-trial motions or by failing to adequately investigate and subpoena Charlie Brown – the defense's only proposed witness – sooner.

## ANALYSIS

¶12.   Ineffective-assistance claims are analyzed under the two-pronged test announced in *Strickland v. Washington.*[2]

> In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. "Judicial scrutiny of counsel's performance [is] highly deferential." There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that but for the attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient.[3]

¶13.   Ineffective-assistance claims generally are reserved for petitions for post-conviction relief because they often rely on materials outside the appellate record.[4]  But this Court will consider an ineffective-assistance claim on direct appeal "if the presented issues are based on facts fully apparent from the record."[5]

*Insufficient Investigation into Charlie Brown*

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)

[3] *Parker v. State*, 30 So. 3d 1222, 1233 (Miss. 2010) (quoting *Strickland*, 466 U.S. at 687–696) (internal citations omitted).

[4] *Parker*, 30 So. 3d at 1232 (citing *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008)).

[5] *Parker*, 30 So. 3d at 1232 (citing *Archer*, 986 So. 2d at 955; *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003); M.R.A.P. 22(b)).

¶14. Williams claims that his trial attorneys rendered deficient performance because "they failed to timely subpoena Charlie Brown, Williams['s] only defense witness," who "would have established that it was reasonable that Tina Brown shot up Carolyn Wells'[s] house because they were women that had both been in a romantic relationship with Charlie Brown."

¶15. Because neither defense attorney spoke with Charlie Brown, Sr., before the conclusion of trial, the defense's proffer concerning his expected testimony came entirely from what Williams had told them. Consequently, this argument is not properly before us. And because this claim cannot be analyzed "on facts fully apparent from the record," this claim is dismissed without prejudice.

*Failure to File Post-Trial Motions*

¶16. Williams's second argument is that his trial attorneys rendered ineffective assistance by "fail[ing] to file any post-trial motions on Williams'[s] behalf," which "deprived Williams of the opportunity to effectively preserve his record for appeal." The State argues that Williams's attorneys *did* file post-trial motions, pointing to the following excerpts from Williams's "notice of appeal" and "designation of record," respectively:

> 4.     A Motion by trial counsel for a Judgment Notwithstanding the Verdict or, in the alternative, for a new trial was denied on the record by the [c]ourt on April 2, 2010.

and

> NOTICE is hereby given . . . that Algernon Williams has taken an appeal to the Supreme Court of Mississippi from the Final Judgment dated April 5, 2010, and the decision of the Circuit Court of Warren County, Mississippi, overruling the Defendant's Motion for New Trial or Judgment Notwithstanding the Verdict dated April 2, 2010 and filed *ore tenus*.

6

¶17.     But the transcript of the sentencing hearing – which was conducted on April 2, 2010 – contains no indication that either of Williams's attorneys moved *ore tenus* for judgment notwithstanding the verdict (JNOV) or for a new trial.  To the contrary, the transcript clearly indicates that Williams's attorneys had *not* filed any such motions by that point.  The record is likewise devoid of any rulings on such post-trial motions.  The State's position essentially is that it must have happened because trial counsel said it happened.

¶18.     The record contains no indication that Williams's attorney made – or that the trial judge ruled on – any post-trial motions for JNOV or new trial.  But even assuming this constitutes objectively-deficient performance, Williams still must show that but for such deficient performance, the outcome at trial probably would have been different.

¶19.     Williams cites this Court's opinion in *Holland v. State*,[6] and the Court of Appeals' opinion in *Johnson v. State*,[7] for the proposition that "trial counsel's failure to file the requisite post-trial motions amounted to ineffective assistance of counsel."  In *Holland*, the defense attorney moved for directed verdict at the close of the State's case, but failed to renew his motion at the conclusion of trial, to request a peremptory instruction, or to move for JNOV.[8]  This Court found that there was insufficient evidence to support the conviction, but that the defendant was procedurally barred from raising insufficiency on appeal because his attorney had failed to raise it at trial:

[6] *Holland v. State*, 656 So. 2d 1192 (Miss. 1995).

[7] *Johnson v. State*, 876 So. 2d 387 (Miss. Ct. App. 2003).

[8] *Holland*, 656 So. 2d at 1197.

> Counsel's failure to move for a directed verdict or request a peremptory instruction, or even file a single post-trial motion deprived the trial judge of the opportunity to review the evidence and reexamine possible errors at trial. . . . In light of the fact that counsel's strategy was to admit guilt to possession while arguing that the evidence was not sufficient to prove intent to distribute, counsel was deficient by failing to preserve any objection relating to the sufficiency or weight of the evidence. This deficiency was intensified by the resulting failure to preserve critical error on appeal.[9]

¶20. But *Holland* is distinguishable from today's case, because this Court's finding in *Holland* that the evidence was insufficient established the second prong of the *Strickland* test, which requires the defendant to show that, but for his attorney's objectively deficient performance, the outcome of the trial probably would have been different. In other words, in a case where the evidence was insufficient, the outcome of trial probably would have been different, had counsel put the issue before the court.

¶21. But here, Williams's only argument is that a motion for a new trial would have given the trial judge an opportunity to review his denial of Williams's request for a continuance. Williams offers nothing to suggest that, had his attorneys moved for a new trial and argued the continuance issue again, the trial judge probably would have granted the motion.

¶22. After the State's case in chief, the parties had an extended conversation with the trial judge in which Williams's attorneys strongly argued for a continuance, even after the judge denied the request. At one point, the judge even said, "I've denied the request for continuance, and I'm not changing my mind about that part of it." Then, after the State

---

[9] *Id.* at 1197- 98 (internal citations omitted).

objected to the defense's mention of Charlie Brown in its opening remarks, the defense again reminded the judge – twice – that it had requested a continuance to secure Brown's presence.

¶23. There is nothing in the record to suggest that, had Williams's attorneys moved for one, the judge likely would have ordered a new trial for his failure to grant a continuance. Moreover, Williams does not even argue that the trial court erred by failing to grant the continuance. So, even assuming that counsel was objectively deficient for failing to make any post-trial motions, Williams has not satisfied the second prong of *Strickland*.[10]

**CONCLUSION**

¶24. Williams has not shown that he was denied his Sixth-Amendment right to effective assistance of counsel. He makes no argument challenging the weight or sufficiency of the evidence. There is no reason to believe the outcome of this case would have been any different, had Williams's attorneys filed the post-trial motions at issue. Finally, Williams's argument that his attorneys did not conduct adequate investigation is not properly before us, as it requires the examination of evidence outside the record. We therefore find that Williams's claims that are properly before us are without merit, and we affirm.

¶25. **CONVICTION OF SHOOTING INTO AN OCCUPIED DWELLING AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH EIGHT (8) YEARS TO SERVE, TWO (2) YEARS SUSPENDED AND TWO (2) YEARS POST RELEASE SUPERVISION. APPELLANT SHALL PAY A FINE OF FIVE (5) THOUSAND DOLLARS WITH TWO (2) THOUSAND SUSPENDED, WITH CONDITIONS, AFFIRMED.**

---

[10] *See* **Parker**, 30 So. 3d at 1235 (distinguishing **Holland** and finding no ineffective assistance because there was "no reasonable probability" that the trial judge would have granted any post-trial motions if made).

**WALLER, C.J., CARLSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY.**